

# UNITED STATES POSTAL SERVICE
# OFFICE OF INSPECTOR GENERAL

## MEMORANDUM OF INTERVIEW

| Interview Date: | 12/19/2018 |
|---|---|
| Case Name: | BERLUCCHI, THOMAS, G. FACILITIES ENGINEER, FERNDALE MI 48330 |
| Case Number: | 16UISL1420CF02CF |
| Interviewee: | MICHAEL RYMAR |
| Interview Location: | PRASAD LEGAL, PLLC<br>117 W. 4TH STREET, SUITE 201<br>ROYAL OAK, MI 48067 |
| Interviewed By: | AUSA STEVEN CARES<br>SA PETER O'SHAUGHNESSY |
| Witnesses: | ANJALI PRASAD, ATTORNEY |

On December 19, 2018, Assistant United States Attorney (AUSA) Steven Cares and U.S. Postal Service Office of Inspector General (USPS-OIG) Special Agent (SA) Peter O'Shaughnessy, interviewed Michael Rymar. Also present during the interview was Rymar's attorney, Anjali Prasad. Prior to the start of the interview, AUSA Cares explained the terms of the proffer, and Rymar responded that he understood. Rymar then provided the following information:

### Background

In 1986, Rymar worked for American Materials Handling (AMH), a business owned by his father. AMH had several salesmen, one of whom had an account with the USPS and dealt with the USPS office in Ferndale, MI. When AMH lost that salesman, Rymar took over the USPS account for AMH. AMH did materials handling; it repaired and installed loading dock equipment, conveyers, and impact doors on loading docks. Rymar bought AMH with his brother in 2007 or 2008. They had the company for approximately 4 ½ years when they had a bad split. After the split, Rymar started his own company, Horizons Materials & Management (Horizons), in April or May 2011. Rymar chose to work with a limited number of customers. Horizons' only customers were the USPS and one other company. He started working with loading dock equipment, and then expanded to brickwork, concrete, and roofing.

RESTRICTED INFORMATION | This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Rymar described AMH as a "brick and mortar" business that had approximately 20 employees. Rymar recognized that having employees meant a lot of overhead, and he decided to have no employees and use only independent contractors at Horizons. He would provide Horizons workers with a truck and tools if they did not have their own. He used workers from Munising, MI, where there were good workers that used to work in mines that were now closed.

Rymar's initial point of contacts at the USPS Ferndale Office were ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Rymar described the postal employees he dealt with as project managers, although he believed ▇▇▇'s title was architect. As an architect, ▇▇▇ sometimes handled larger projects. After ▇▇▇▇▇▇▇▇ retired, Tom Berlucchi and ▇▇▇▇▇ were his contacts at the USPS Ferndale Office. Sometime later, ▇▇▇▇▇▇ was brought in because ▇▇▇ and Berlucchi needed help because there was so much work. Rymar recalled that in the 1980's, USPS project managers would go out to every job; and by 2011 they would release jobs to whichever contractor they worked best with. At the USPS, projects were broken up between projects costing under $10,000, and those costing over $10,000. All the jobs Rymar handled for the USPS were less than $10,000. Projects costing over $10,000 had to go through USPS Hubworks, which was a more extensive process. Rymar said that jobs costing over $10,000 were an obstruction for USPS project managers because of the more extensive process. Rymar said the project managers would break jobs into multiple jobs to avoid this process. For example, if a post office needed a $15,000 air conditioning unit, the project manager would contact the postmaster and tell him to call in another job for heating or ductwork, for example. They would charge half of the job to the original job number, and the other half to the false job that was created.

By the years 2017-18, Rymar estimated that Horizons handled approximately 175-225 jobs per year for the USPS, and approximately 95% of his business was with USPS. His other customer, ▇▇▇▇▇▇▇▇▇▇ was much smaller. His contact at ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇ For the USPS, Horizons handled anything building maintenance-related. Rymar explained he needed to find a niche, and for him it was rural areas where it was hard to find local contractors. For example, when ▇▇▇ area of responsibility changed from Great Lakes to the Eastern area, ▇▇▇ had trouble finding contractors in West Virginia. Rymar told ▇▇▇ he would need to get many jobs in that area to make it work. Rymar sent workers from Munising there and put them up in hotels, and provided tools for them to use on the jobs.

**Painted Post, NY security grill**
Rymar was asked to go through the process of getting a typical job from the USPS. He brought notes with him related to a job Horizons did in Painted Post, NY (USPS Problem #2572039) to replace a security grill in the retail area. He attempted to recreate what happened on the job by going through old emails; he did not have his job folder because it was taken by agents during the search warrant conducted at this home.

Page 2

RESTRICTED INFORMATION | This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

Rymar advised he received an email in October 2016 from ▓▓▓ asking whether he could look at the security grill and he replied quickly that he could. Rymar advised he contacted the postmaster to get more details about the problem and asked her to send him some photos. Rymar said he would have searched Google Maps on the internet to see if he could see photos of the outside of the building to determine how to bring the product in and other logistics. Rymar then determined whether he would use a worker from Munising or a local contractor to do the job. Rymar said he called local contractors but none of them called him back. He said he got a local group from Munising to go look at it, and was looking up pricing to see if he could have his own guys do it. He ultimately did find a local contractor to do the job. It was a union contractor that wanted prevailing wage to do the job. Rymar agreed to a price with the contractor, however there were problems at the site and the contractor's price changed. The contractor sent documents to him via fax. The job took place around Christmas 2016. The postmaster wanted to delay the job until after Christmas, but Stanon wanted it done before. The installation was done after Christmas. Rymar said he spent more time and money on the job than he wanted. Rymar explained that project managers have a time frame to get the job done, and its normal for the general contractor to have to move a date to get it done within a 30, 60 or 90-day time frame.

Rymar was shown the labor sheet he submitted to the USPS for the Painted Post job **(Attachment 1)**. The two Horizons workers that appeared on the timesheet were ▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Rymar described ▓▓▓▓ as a leader on many jobs and ▓▓▓▓▓ as a "kid" that ▓▓▓▓▓ used. ▓▓▓▓▓ typically liked to use a team of three workers. When asked if both ▓▓▓▓▓▓▓▓▓▓▓▓▓ worked eight hours each on the job (as shown on the timesheet), Rymar said they went to the site to look it over initially. He said they were close by on another job and sent him some photos via email. Rymar said he communicated with them via email. He thought ▓▓▓▓▓▓▓▓▓▓▓▓ only did an inspection of the problem. The contractor later told him they had to remount the grill and run the electricity differently. Rymar thought he may have had ▓▓▓▓▓ look at the electrical issues and take photos, but he did not recall.

Rymar was shown the quote he submitted to the USPS for the Painted Post job **(Attachment 2)**. Rymar advised he would have provided the quote to ▓▓▓▓▓ and that it was very normal for the quote to be provided late. ▓▓▓▓▓ Berlucchi, and ▓▓▓▓▓ would tell him they would want an idea of what he was doing, verbally was fine, but they did not need a breakdown or quote right away. Rymar stated he typically submitted quotes after the job was done, and just prior to signing the contract with the USPS. Rymar was shown an email dated March 23, 2017 that he sent to ▓▓▓▓▓ with the quote attached **(Attachment 3)**; Rymar confirmed that would have been when he submitted the quote to ▓▓▓▓▓. He typically emailed the quotes to the project managers. Rymar said it was a significant amount of time from the time he received a job, to the time he was paid by the USPS. Rymar was shown the Horizon invoice for $8,950 that was billed to the USPS for the Painted Post job **(Attachment 4).** He said the completion date of 12/22/2016 shown on the invoice, was not accurate and he believed the job was

RESTRICTED INFORMATION | This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

probably completed in early January 2017. Rymar was shown a $4,865 invoice from Rockwood Doors, the contractor he used at Painted Post, which was stamped paid by Horizons on January 20, 2017. Rymar advised the paid date of January 20, 2017 would have been close to when the job was finished.

▇▇▇▇▇▇ did quite a lot of work for Rymar. ▇▇▇▇▇▇ also did contracting jobs separate from Rymar in the Munising area, but he primarily worked for Rymar. Rymar did not know what ▇▇▇▇▇▇ did in his spare time. By late 2016/early 2017, Rymar had a rotating group of individuals that worked for him. He estimated he had approximately 10-15 workers he used. Rymar did not just put ▇▇▇▇▇▇ on the payroll sheets submitted to USPS; he would put the names of the workers that worked on the job. Rymar was confident in the rates he paid his workers; if they were traveling, Rymar provided the truck they drove, purchased the tools they used, and paid for a hotel and per diem.

Rymar stated that he was told by ▇▇▇▇▇▇, and later by Berlucchi and he believed ▇▇▇▇▇▇ that he needed to include a payroll statement with his paperwork, even though Rymar told them he did not have employees. Rymar said that ▇▇▇▇▇▇ and Berlucchi told him they needed some kind of payroll if he wanted to get paid. ▇▇▇▇▇▇ and Berlucchi told him the payroll forms needed to be filled out each week. Rymar was again shown the certified payroll form he submitted with the Painted Post retail grill job **(Attachment 1),** and was asked if ▇▇▇▇▇▇ worked on 12/14/2018 as shown on the form. Rymar responded that they did not necessarily work 8 hours on that particular date, and they probably did not. Rymar advised that, many years ago, if he turned in more than one payroll sheet, ▇▇▇▇▇▇ would ask if he really needed all of them and if he could just put the information on one form. Berlucchi also told him he did not want to see more than one payroll sheet. When asked why he categorized some of the labor hours on the invoice as "Millwright," Rymar responded that was the time his workers spent inspecting the metal work at Painted Post. Rymar did not know if the 8-hour figures were accurate without reviewing his file, but said it would include travel time from their hotel. Rymar advised that ▇▇▇▇▇▇ told him Rymar could bill his workers' time to the USPS in blocks of 4 hours, even if they worked only one hour. On paper, the extra money he received from USPS for this "unworked" time went to him, however, Rymar stated that it is split between him and his workers. Rymar advised he paid his workers bonuses based on the amount of work done, for example, ▇▇▇▇▇▇ may get a $600 bonus on a job and ▇▇▇▇▇▇ a $300 bonus.

When asked if ▇▇▇▇▇▇ knew that Rymar billed the USPS $6,865 for the subcontractor used on the Painted Post job, when the subcontractor was only paid $4,865, Rymar replied that ▇▇▇▇▇▇ was not aware of that. However, Rymar estimated he spent 16.5 hours on investigation and 10 hours on supervision/sign-off for a total of approximately 27 hours on the Painted Post job. Rymar advised he arrived at a bottom-line figure of $8,950 for the Painted Post job after looking at what the market would bear. When asked if "what the market would bear" meant what the USPS project manager was

Page 4

| RESTRICTED INFORMATION | This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution. |

willing to pay based on the false documents, Rymar agreed that it was. Rymar believed ▓▓▓▓ and Berlucchi knew what a job should cost. Rymar advised that any time a project manager saw a price they did not like, they would tell him, and he would lower it. Rymar said this happened on a very small percentage of jobs, it possibly happened 10 to 25 times. Rymar said it was not always after he submitted an invoice that it was rejected, sometimes he would tell a project manager a price and they would tell him no prior to submitting an invoice. Rymar advised he falsely showed the subcontractor on the Painted Post job as "Van Ert Electric" because he did not want Berlucchi to know who he used to do the work. According to Rymar, Berlucchi was directly contacting some of his subcontractors to save money, so Rymar would conceal who he used.

**Instructions from USPS Project Managers**
Rymar advised that he typically submitted the quotes and all other paperwork after the jobs were completed. He emailed the quotes and hand-delivered all the other documentation. Rymar's understanding was that the cost breakdowns on the quotes were needed for audit purposes only, and did not necessarily need to be accurate on a line-by-line basis. Rymar advised that in approximately 2011, when he dealt with ▓▓▓▓▓▓▓▓ he was having trouble putting together the cost breakdowns for jobs. The project managers were questioning everything on his cost breakdowns, particularly ▓▓▓▓

At around this time, Berlucchi showed him an example of a breakdown from a larger company, ▓▓▓▓▓▓▓▓ which was located in Michigan, and told Rymar it was the type of breakdown they expected to see. Berlucchi told Rymar that the amount he charged for his own time should be low, and to put his profit under some other line item on the invoice. Rymar recalled this conversation took place at Rymar's house. Rymar advised he and Berlucchi agreed Rymar would show an 8% profit on his jobs.

Rymar said that ▓▓▓▓ also told him to fudge numbers on the invoices. For example, Rymar would submit an invoice to ▓▓▓▓ for $6,800 and ▓▓▓▓ would tell him that the fiscal quarter was tight at the USPS, and would ask Rymar to give him a price under $5,000. ▓▓▓▓ would tell Rymar to put the difference on another job.

▓▓▓▓ did not tell Rymar to falsify numbers on his quotes and invoices. However, Rymar recalled there was an air conditioning job in approximately September 2017, where ▓▓▓▓ told Rymar he had a postmaster call in and create three additional fake jobs, so ▓▓▓▓ could break a $40,000 job into four jobs costing below $10,000 each. The additional jobs would have been somewhat related to air conditioning, such as ductwork. Rymar was not the contractor on this job and he does not recall which contractor was assigned the work. Rymar advised the job was somewhere in Michigan, but outside the Detroit area. Rymar stated that ▓▓▓▓ told him about this job.

Rymar recalled being told by Berlucchi and ▓▓▓▓, at different times, to "watch your material costs," or "watch your labor costs." Rymar also heard them giving the same

Page 5

| RESTRICTED INFORMATION | This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution. |

instruction to ▇▇▇▇ from ▇▇▇ another postal contractor.  Rymar took these instructions to mean to put his costs somewhere else other than in labor and materials on his cost breakdowns.   Rymar advised he was given instruction, either implicitly or explicitly, that he could use false documents to support his price.  Rymar did not recall if the cost breakdowns he submitted were more accurate and realistic during the time ▇▇▇ was questioning them in 2011.

**False Documents/Loss to USPS**
Rymar admitted that the documentation he submitted to the USPS was not accurate including dates, payroll, and cost breakdowns.  Rymar advised he would put a false completion date on documents, to make it appear a job was completed earlier than it was.  The labor forms he submitted were not accurate or truthful, including the number of hours paid, and there were no payroll withholdings taken.  His workers were paid at times more, and at times less than the hourly rates shown on the payroll forms.  The documents were also false as to the amount of profit he received at his company.  Rymar chose the bottom line price for a job because he recognized it would be an acceptable price to the project managers.  Rymar stated that he was told by USPS employees that paying a premium at USPS was acceptable.  Rymar advised he made the same profit on jobs he did for his other customer, ▇▇▇▇▇▇▇▇.  ▇▇▇▇▇ does not require detailed invoices like USPS; Rymar just gives ▇▇▇ a total price.

Rymar admitted that he submitted false documents to the USPS and there was a loss to the USPS because of this activity.  He stated the amount of loss to the USPS was hard to estimate, and he would have to review it on a job by job basis.  For the Painted Post job, he advised he may have worked more hours than he billed, and there was possibly no loss on that job.  When asked why it showed he made a 41% profit in his Painted Post job folder, Rymar explained that figure did not include all the hours he put in, or extra costs that might be involved like taxes.  Rymar also advised he researched hourly rates charged by contractors in the Detroit area, and he discovered they charged $200 per hour.  Berlucchi's boss, ▇▇▇▇▇▇ expected to see only $130 per hour charged on the invoices to the USPS.  Rymar printed out his research from the internet and put it in a file labeled "Labor Justification" which was taken by agents during the search warrant.

**Benefit to USPS Project Managers**
When asked why ▇▇▇▇ and Berlucchi would instruct him to falsify documents, Rymar replied that for ▇▇▇ it was peace of mind.  ▇▇▇▇ was near retirement and wanted the paperwork to pass muster.  Rymar also stated that ▇▇▇ "drank a lot."  But if ▇▇▇ did not think a job was priced right, he would tell Rymar.  Rymar stated that Berlucchi's incentive was personal gain, primarily at the Historic Fort Wayne Coalition (HFWC), which Berlucchi controlled.

Rymar recalled one occasion where Berlucchi had cannons put in at the HFWC including concrete work, and Berlucchi told him the work was done by ▇▇▇   Rymar

Page 6

RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General.  This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General.  Unauthorized release may result in criminal prosecution.

recalled another occasion where there was a flag pole damaged at the Historic Fort Wayne because of a storm. Berlucchi asked Rymar to fix the flag pole and Rymar said he could not do it. Berlucchi later told Rymar ▒▒▒▒ from ▒▒ took care of it. Rymar could not say if people were using favors to get more business with the USPS.

Rymar advised ▒▒▒▒ would host elaborate golf outings, and its owner, ▒▒▒▒ would take ▒▒▒▒ Berlucchi, and ▒▒▒▒ Rymar also believed ▒▒▒▒ would take ▒▒▒▒ Berlucchi, and ▒▒ to lunch weekly. Rymar was with them on one occasion, approximately three years ago, and they told him they go all the time. Rymar also advised ▒▒▒▒ took ▒▒▒▒, Berlucchi, and ▒▒ to Hilton Head annually for a long weekend, and to Mackinac Island annually for a golf trip. Rymar believed these things were all paid for by ▒▒▒▒. Rymar advised that Berlucchi is broke and does not have any money.

Rymar advised there was also an occasion early on, he believed in September to November 2011, where Berlucchi asked him to asphalt a road at the Historic Fort Wayne. Rymar advised he spent at least $1,000 to hot patch the road. Rymar was positive he charged that back to the USPS and took less profit than he otherwise would have on the job. Rymar advised there would be an invoice from an asphalt contractor in his job folder; he did not remember the name of the contractor but thought there was a picture of an asphalt truck on their invoice.

Rymar also paid for hotels rooms for Berlucchi. He recalled one occasion where Berlucchi told him he was going to Kentucky and that he needed 3 hotel rooms for 3 nights, and asked Rymar to set it up for him. Rymar advised he paid for 3 hotel rooms for 3 nights two years in a row for Berlucchi. Rymar believed Berlucchi told him it was for Civil War reenactments the HFWC was doing in that area. Rymar was a member of the HFWC. Rymar was getting a lot of work from Berlucchi during this time, and that was the reason he did favors for Berlucchi when Berlucchi asked. Rymar said he became uncomfortable doing these things, and ultimately tried to get more work from ▒▒▒▒.

Rymar also paid for a hotel room for Berlucchi to attend his daughter's competition in the Special Olympics. Berlucchi asked Rymar if he could help him, and Rymar paid for the hotel room. Rymar believed the hotel was located in Mount Pleasant, MI. Rymar also made two $5,000 donations to the HFWC; he did not recall if Berlucchi asked for the donations. Berlucchi also went on free hunting trips with Rymar. ▒▒▒▒ also went on the trips, but he paid his own way; ▒▒▒▒ wrote Rymar a check to reimburse him. Rymar once spent $850 for Berlucchi's birthday, when he took Berlucchi and his wife out to dinner. Rymar stated that Berlucchi "never paid for a stick of gum."

Rymar advised he also did work on Berlucchi's cottage in 2014. He removed and replaced a couple porches, and replaced approximately the back third of the roof. ▒▒▒▒ ▒▒▒▒ and some of his guys did the work. Berlucchi told Rymar to put the cost of the

Page 7

renovations to his cottage on the Horizons bills to the USPS. Berlucchi told Rymar to "put $500 here, and $500 there" on the invoices. Berlucchi never paid Rymar anything for the cottage renovations or the hotel rooms. Rymar believed he charged the USPS a total of $10,000-$11,000 for the porches and roof replacement at Rymar's cottage. He believed he spread this cost over 8 jobs. Rymar believed he still had the paperwork showing the jobs he charged, and that it was not taken during the search warrant at his residence. Berlucchi also asked Rymar if he could do work on the furnace and ductwork at his cottage, but Rymar refused. Rymar believed Berlucchi had ▓▓▓ from ▓▓▓ complete that work.

**Other contractors**
Rymar had no evidence that other contractors submitted false documents to the USPS, but he believed some possibly did. Rymar advised he never saw paperwork from ▓▓▓ but thinks its owner, ▓▓▓ may be submitting false documents because of the way he was doing business.

Rymar also mentioned ▓▓▓ as a contractor that may be submitting false documents, but provided no specifics. Rymar advised that he saw a quote from ▓▓▓ that showed employees and a 15% profit margin. Rymar did not believe the owner, ▓▓▓, had any employees. Rymar was not aware of ▓▓▓ providing anything of value to Berlucchi or ▓▓▓. Rymar also advised that ▓▓▓ owner of ▓▓▓ once told him he would change completion dates on his paperwork to make it appear jobs were done earlier. ▓▓▓ retired approximately three years ago.

**USPS-OIG Request for Horizons paperwork**
▓▓▓ contacted Rymar regarding the USPS-OIG request for Horizons records that occurred in approximately March 2018. ▓▓▓ was asked to produce paperwork on six Horizons jobs. Berlucchi received the same type of request from his boss. Berlucchi did not let Rymar know about the audit, but, at the time, Berlucchi was missing paperwork on 3 or 4 jobs, and requested it from Rymar. Rymar did not have to provide any paperwork to ▓▓▓. ▓▓▓ told him something was not right, and sent him the list of the six requested jobs. Rymar did not change anything on the paperwork related to the jobs, and neither Berlucchi nor ▓▓▓ asked him to make changes. Rymar made copies of what ▓▓▓ gave him and put it in his files. Rymar reviewed the files but does not believe he added or removed paperwork from them. He did group the files together.

**Other information**
Rymar changed the cost breakdowns on his quotes after the USPS-OIG request for records in March 2018. He advised he tried to make the breakdowns more realistic and put more hours under investigation/supervision, and they were accepted and paid by the USPS. Rymar stated he submitted these more realistic quotes to the following project managers (the approximate number of jobs are in parentheses): ▓▓▓

RESTRICTED INFORMATION

This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.

███████████████████████████████████ and Tom Berlucchi (1 job). According to Rymar, the project managers tolerated more hours under investigation and supervision on these cost breakdowns.

**Attachments**

1.  OD- Rymar MOI attach- 12-19-2018.pdf

| PREPARED BY: SA PETER O'SHAUGHNESSY | DATE: 12/20/2018 |

RESTRICTED INFORMATION — This report is furnished on an official need to know basis and must be protected from dissemination which may compromise the best interests of the U.S. Postal Service Office of Inspector General. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the Office of Inspector General. Unauthorized release may result in criminal prosecution.